IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division

| | |
|---|---|
| In re:<br><br>**Custom Design Group, LLC**,<br><br>Debtor. | Case Number: 20-50463<br><br>Chapter 11, Subchapter V |

### DEWYONE KING'S MEMORANDUM OF LAW IN SUPPORT OF PLAN CONFIRMATION

Dewyone "Pedie" King ("Pedie"), an equity security holder in the debtor, Custom Design Group, LLC (the "Debtor"),[1] by and through counsel, hereby files this *Memorandum of Law* in support of Plan confirmation and respectfully represents the following in support:

## I. INTRODUCTION

The Plan serves the best interests of all constituencies to this Chapter 11 Case. The Plan provides for payment in full to the Debtor's woefully undersecured secured lender, which lender supports the Plan. The Plan additionally provides a meaningful—lumpsum—payment to the Debtor's bankruptcy estate on the Effective Date, when, by all accounts, there will be nothing available for unsecured creditors in a conversion or dismissal. And the Plan accomplishes this through the transparent confirmation process, which benefits all involved, including Pedie.

The alternatives are bleak. The Debtor's lender has already: (1) received, in this Chapter 11 Case, a favorable adjudication of its secured claim against all of the Debtor's assets; (2) filed a motion for relief from stay (scheduled for continued hearing the same day and time as the confirmation hearing); and (3) teed up a claim and delivery action in state court. Accordingly, absent confirmation, the lender will obtain relief from stay and liquidate the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings prescribed in the Debtor's *Second Amended Plan of Reorganization* (ECF No. 104) (the "Plan") filed on July 2, 2021.

Debtor's assets in short order, leaving nothing for unsecured creditors (or administrative expense claimants). Although Pedie is the most likely bidder for the Debtor's assets through the lender's foreclosure, Pedie would not receive the same comfort buying the assets out of a foreclosure as he would buying the assets through the more open and transparent bankruptcy process.

All parties' financial interests are best served by confirming the Plan.

## II.    PROCEDURAL BACKGROUND

On December 11, 2020 (the "Petition Date"), the Debtor initiated this Chapter 11 Case by filing a voluntary petition for relief under subchapter V of the Bankruptcy Code.[2] A "Corporate Resolution" was attached to the petition, whereby Richard L. Stober ("Stober"), purporting to act for the Debtor "without holding a formal meeting of the members/officers," authorized himself to file this Chapter 11 Case.[3] On January 20, 2021, Pedie—one of two members of the Debtor at that time—filed a *Motion to Dismiss* this Chapter 11 Case (the "Motion to Dismiss") on the basis that the Debtor lacked the corporate authority to file the petition without Pedie's consent.[4]

In the Schedules prepared by Stober, Stober—purporting to act on behalf of the Debtor—did not disclose that his sister, Teresa S. King ("Teresa"), had any sort of claim against the Debtor,[5] or any sort of equity interest in the Debtor.[6] On February 2, 2021, Felton E. Parrish and the law firm of Alexander Ricks PLLC filed a notice of appearance on behalf of Teresa in the Chapter 11 Case.[7]

---

2     ECF No. 1, at 1–4.
3     ECF No. 1, at 5.
4     ECF No. 32.
5     *See* ECF No. 1, at 18–29.
6     *See* ECF No. 1, at 44, 47.
7     ECF No. 42.

Less than a month after the Petition Date, the Debtor's secured lender, Peoples Bank, filed a motion seeking, *inter alia*, a declaration from the Court regarding its secured status in the Debtor's assets (the "Secured Status Motion").[8] The Secured Status Motion came on for hearing before the Court repeatedly on the following dates: January 27, 2021; March 5, 2021; April 16, 2021; May 7, 2021; and June 4, 2021. While some of the relief requested in the Secured Status Motion remains to be resolved by the Court (*e.g.*, relief from stay), the Court entered an order on June 24, 2021 (the "Secured Status Order") partially granting the Secured Status Motion by holding that Peoples Bank holds a "properly perfected . . . security interest in all inventory, equipment, accounts and other personal property."[9] The Secured Status Order also established allowed amounts of Peoples Bank's claims that vastly exceed the value of the Debtor's assets.[10]

On March 4, 2021, without Pedie's consent or proper corporate authority, the Debtor filed a *Plan of Reorganization* in this Chapter 11 Case (the "Unauthorized Plan").[11]

Partially in an effort to resolve the Motion to Dismiss and other issues between Pedie and Stober relating to the Chapter 11 Case, Pedie purchased Stober's interest in the Debtor, which transaction closed on March 5, 2021, and, thereupon, Pedie became the person with full control over the Debtor's day-to-day business operations and financial affairs.[12] With Pedie at the helm, the Debtor filed an amended plan on April 30, 2021,[13] which was subsequently amended by the current iteration of the Plan on July 2, 2021.

---

[8] ECF No. 30.

[9] *See* ECF No. 103, at 6.

[10] *Compare* Secured Status Order, ECF No. 103, at 3–6 (*i.e.*, $783,354.98, plus applicable per diem), *with* the Plan, ECF No. 104, at 24 (attaching liquidation analysis showing disclosing total realizable assets having an aggregate value of $343,274.91).

[11] ECF No. 57.

[12] *See Affidavit of Dewyone King* filed contemporaneously herewith, which is incorporated herein by reference (the "Pedie Affidavit"), at ¶ 10.

[13] ECF No. 83.

The Plan's basic construct is that a to-be-formed company affiliated with Pedie (Newco) will purchase all of the Debtor's assets on the Effective Date for the following purchase price (paid in a lumpsum on or before the Effective Date): (1) an agreed-upon amount necessary to satisfy the Peoples Bank Secured Claims in full; PLUS (2) an amount in excess of what the unsecured creditors could hope to recover in a hypothetical chapter 7 case.[14]

The only party-in-interest objecting to confirmation of the Plan is Stober's sister, Teresa.[15]

### III. FACTUAL BACKGROUND

#### A. History of the Debtor's Operations and Financial Affairs

The Debtor specializes in the design and production of customized apparel, uniforms, sporting equipment, and promotional products. However, the Debtor itself does not typically manufacture such products. Rather, the Debtor outsources the manufacturing or production to third parties, primarily its affiliate, CDG-Paw, LLC ("Paw").[16]

Peoples Bank was the Debtor's primary prepetition lender. The most recent loans from Peoples Bank were structured in a way that Paw signed the promissory notes and the Debtor signed unconditional guaranties, but all, or nearly all, obligations were cross-collateralized and secured by the assets of both Paw and the Debtor.[17] On November 6, 2020, Peoples Bank sent three letters to the Debtor confirming defaults under all of the applicable promissory notes and related agreements and demanding immediate payment.[18]

---

[14]  *See* ECF No. 104, at 1–2.

[15]  *See* ECF No. 89 (hereinafter referred to as "Teresa's Objection"). The Debtor's former law firm, Moon Wright & Houston, PLLC, objected to confirmation of a prior version of the Plan on technical grounds, which objections have been cured by the current iteration of the Plan. *Compare* ECF No. 92 *with* ECF No. 104.

[16]  *See* Pedie Affidavit, at ¶ 3.

[17]  *See* Proofs of Claim Nos. 6, 7, and 8.

[18]  *See* Pedie Affidavit, at ¶ 12.

Prior to this Chapter 11 Case, Stober was responsible for the day-to-day management of both Paw and the Debtor. However, less than a month after the Petition Date, Stober refused to further oversee or otherwise participate in the management Paw's business operations or financial affairs. Out of necessity, Pedie assumed day-to-day oversight of Paw at that time.[19]

Pedie quickly realized at that time that the Debtor was not paying Paw (the Debtor's primary and most substantial vendor) for services rendered post-petition.[20] Upon further investigation, Pedie learned that Debtor had not being paying Paw for services rendered for at least one year prior to initiation of this Chapter 11 Case.[21] The Debtor is Paw's largest customer, comprising the vast majority of orders fulfilled by Paw on both a volume and value basis.[22]

### B.    The Debtor's Post-Petition Cash Issues

Rather than prepare a week-by-week or month-by-month budget for cash collateral purposes based on the actual timing of projected receipts and disbursements, the Debtor's cash collateral budget in this Chapter 11 Case has been based on monthly historical averages.[23] The Debtor's cash collateral budget in this Chapter 11 Case estimated $208,948.00 in monthly income, $208,096.57 in monthly costs of goods sold and other expenses, and $851.43 in monthly disposable income.[24]

Between the Petition Date and December 31, 2020, the Debtor generated approximately $90,500 in cash but expended approximately $84,500, thereby facially increasing its cash

---

[19]    *See* Pedie Affidavit, at ¶¶ 4, 7–8.
[20]    *See* Pedie Affidavit, at ¶ 8.
[21]    *See* ECF No. 1, at 38 (response to SOFA Item 4).
[22]    *See* Pedie Affidavit, at ¶ 9.
[23]    *See* ECF No. 10-1, at 2; ECF No. 17, at 6; and ECF No. 43, at 5.
[24]    *See* ECF No. 10-1, at 2; ECF No. 17, at 6; and ECF No. 43, at 5.

position by approximately $6,000 in December, but the Debtor also incurred, but did not pay, approximately $11,000 in post-petition liabilities in the month of December.[25]

In January 2021, the Debtor generated approximately $216,000 in cash but expended approximately $241,000, thereby losing approximately $25,000 in cash in January.[26]

In February 2021, the Debtor generated approximately $231,000 in cash but expended approximately $294,000, thereby losing approximately $63,000 in cash in February.[27]

On the Petition Date, the Debtor had $24,016.50 on deposit at Peoples Bank.[28] Upon information and belief, Peoples Bank and the Debtor had an understanding that the Debtor would not spend the funds on deposit at Peoples Bank without first informing Peoples Bank. In February of 2021, the Debtor expended all of the funds on deposit at Peoples Bank.[29]

Based on the expenditure of the funds on deposit at Peoples Bank and the Debtor's otherwise rapidly depleting cash position, Peoples Bank threatened emergency action, including seeking, on shortened notice, relief from stay to foreclose on the Debtor's assets.[30] This happened shortly after Pedie assumed control of the Debtor. As a result, Pedie—using Pedie's own money—paid Peoples Bank $49,000.00 in adequate protection payments in April to prevent an immediate liquidation of the Debtor's assets by Peoples Bank.[31] Similarly, due to various cash crunches that have occurred since Pedie assumed control of the Debtor in March, Pedie has had to infuse an aggregate of $55,000 from Pedie's personal funds into the Debtor in emergency

---

[25] ECF No. 37, at 2.
[26] ECF No. 54, at 2.
[27] ECF No. 70, at 2.
[28] ECF No. 1, at 11.
[29] ECF No. 70, at 5–8.
[30] See Pedie Affidavit, at ¶ 13.
[31] See Pedie Affidavit, at ¶ 13.

situations to keep the Debtor operating.[32] Furthermore, Pedie was compelled to use $10,000.00 of his own money to fund a $10,000.00 retainer to the Debtor's counsel shortly after taking over management of the Debtor because the Debtor lacked the cash necessary to do so.[33]

### C. Status of Paw's Assets and Operations

Stober had also left Paw in a dire cash situation. Since taking over Paw's operations in January, Pedie has had to infuse an aggregate of $219,470 from Pedie's funds into Paw to keep Paw operating.[34] Paw's 2020 end-of-year balance sheet—created while Paw was under the control of Stober—reveals less than $400,000 in total assets *before* accounting for depreciation, ignoring claims against the Debtor and "goodwill."[35] The Debtor and Stober saw so little value in Paw's enterprise that, within a month of initiating this Chapter 11 Case, the Debtor and Stober planned to shut down all of Paw's operations.[36] The Debtor characterized Paw to this Court as follows: "that experiment did not work out well, the related company wound up costing more money than it produced."[37] Paw only exists today because of hundreds of thousands of dollars in fresh capital from of Pedie's personal funds and Pedie's herculean efforts toward running Paw (and, subsequently, the Debtor) himself.

---

[32]     *See* Pedie Affidavit, at ¶ 14.

[33]     *See* Pedie Affidavit, at ¶ 15. Although, given the emergency nature of the cash needs, Pedie has not petitioned this court for approval of these transactions with the Debtor, Pedie hopes that confirmation of the Plan will moot any effort by him to seek allowance of an administrative expense claim for these cash infusions.

[34]     *See* Pedie Affidavit, at ¶ 20.

[35]     *See* Pedie Affidavit, at ¶ 18.

[36]     *See* Pedie Affidavit, at ¶ 7.

[37]     *See* Courtroom Recording of 12/18/2020 Hearing, ECF No. 20, at 08:49–09:54.

### D. Teresa's Position

According to Teresa's proof of claim in this Chapter 11 Case, in March of 2019, Teresa loaned $550,000 to the Debtor on an unsecured basis.[38] Also according to Teresa's proof of claim in this Chapter 11 Case, the loan was made with the expectation that the Debtor would merge with Paw, and "upon completion of the merger" the loan would be converted to a one-third (1/3) economic interest in the merged entity.[39] Teresa's proof of claim in this Chapter 11 Case also asserts that the loan balance has grown to $627,632.88 based on interest accrued before the Petition Date.[40]

In Teresa's Objection, Teresa avers that she was provided, and executed, a First Amended Operating Agreement for Paw (the "Paw OA"), which provided Teresa with a one-third (1/3), non-voting economic interest in Paw.[41] However, according to Teresa's Objection, Teresa understood that the Paw OA would govern the affairs of a newly-merged entity and it was not until after the Petition Date that Teresa discovered that the entities were never merged.[42]

Upon discovering that the entities had not merged, Teresa took no action to challenge the bankruptcy filing, seek substantive consolidation of the Debtor with Paw, or otherwise bring her position to the attention of the Bankruptcy Court, other than to file an unsecured claim in the amount of $627,632.88. On information and belief, Teresa asserts that she both (i) owns a one-third (1/3) economic interest in Paw based on her $550,000 loan to the Debtor and also (ii) holds

---

[38]    *See* Proof of Claim 21-1, Part 2, at 4.

[39]    *See* Proof of Claim 21-1, Part 2, at 4.

[40]    *See* Proof of Claim 21-1, Part 2, at 4.

[41]    *See* Teresa's Objection, ECF No. 89, at 1.

[42]    *See* Teresa's Objection, ECF No. 89, at 1.

an equitable interest in the Debtor and/or unsecured claim against the Debtor in the amount of at least $550,000.[43]

On or around May 28, 2021, Teresa submitted a ballot voting to reject the Plan as a Class 4 General Unsecured Claim in the amount of $627,632.88.

Based on Teresa's various allegations, it remains unclear (i) whether Teresa asserts (or holds) an unsecured claim against the Debtor and/or Paw, (ii) whether Teresa asserts (or holds) an equity interest in the Debtor and/or Paw, or (iii) at what amounts those claims or interests should be valued.

Teresa's Objection raises three confirmation issues:

1. whether the Plan is fair and equitable within the meaning of § 1191(c)(2) of the Bankruptcy Code[44];

2. whether the Plan complies with § 1190(1)(C)'s requirement that a plan include projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization[45]; and

3. whether the Plan contains non-consensual third-party releases.[46]

The current iteration of the Plan clarifies that the Plan does not seek to release or otherwise affect pre-petition claims that any creditor may have against non-Debtor third parties, thereby mooting the third confirmation issue raised in Teresa's Objection. Accordingly, this brief focuses on the first two enumerated objections.

---

[43]  *See* Pedie Affidavit, at ¶ 22.

[44]  *See* Teresa's Objection, ECF No. 89, at 2–4, ¶¶ 6, 8–11.

[45]  *See* Teresa's Objection, ECF No. 89, at 3, ¶¶ 6–7.

[46]  *See* Teresa's Objection, ECF No. 89, at 4, ¶ 12.

## IV. ANALYSIS

### A. General Confirmation Requirements

With the exception of § 1129(a)(8) of the Bankruptcy Code, no party disputes that the Plan satisfies all of the requirements of § 1129(a), all of which requirements are supported by the facts presented in the Pedie Affidavit and the general record in this Case.[47]

### B. Consensual Plan Versus Nonconsensual Plan

As to § 1129(a)(8), a threshold determination must be made as to the nature and extent of Teresa's position in this Case.

It is not clear whether Teresa holds an unsecured claim or whether Teresa holds an equitable ownership interest in the Debtor. To the extent Teresa holds an equitable ownership interest, then Teresa's vote rejecting plan would be grouped in the Plan's Class 5 ("Equity Interests in the Debtor"), where her vote would be drowned by Pedie's super-majority equity interest in the Debtor. As a result, Class 5 would be deemed to accept the Plan pursuant to § 1126(d) of the Bankruptcy Code, as would Class 4 pursuant to § 1126(c).

On the other hand, to the extent Teresa holds an unsecured claim, a question remains as to the value of that claim for purposes of tabulating votes. Under any circumstance, a majority in number of the holders of Class 4 claims have voted to accept the Plan. However, for the Plan to meet § 1126(c)'s two-thirds in amount threshold, Teresa's claim would need to be valued at $235,000 or less. Although Teresa asserts a $627,632.88 unsecured claim in her proof of claim and plan ballot, she also asserts a one-third (1/3) economic interest in Paw based on the same dollars invested. Presumably, if Teresa is correct that she holds a one-third (1/3) economic interest in Paw based on her $550,000 payment to the Debtor, then, assuming she has an

---

[47] *See* Pedie Affidavit, at ¶¶ 27–42.

enforceable claim against the Debtor, Teresa would not be owed the full amount of $627,632.88 (or $550,000), depending upon the value assigned to the interest in Paw. If Teresa's claim amount is valued at $235,000 or less, then the Plan meets the requirements of § 1126(c), § 1129(a)(8), and § 1191(a) for consensual confirmation.

Notwithstanding, the remainder of this brief will assume *in arguendo* that Teresa holds a claim against the Debtor in excess of $235,000 and, therefore, the Plan must meet the cramdown requirements of § 1191(c)(2) of the Bankruptcy Code.

### C. The Plan Satisfies § 1190(1)(C)

Section 1190(1)(C) requires a plan to include "projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization."

Here, the only payments the Debtor is required to make pursuant to the Plan are: (a) the distribution of the cash paid to the Debtor on the Effective Date by Newco; and (b) the distribution of avoidance action recoveries, if any. In other words, the Plan is more akin to a sale plan or a liquidation plan than a traditional rehabilitation plan as the Plan payments will not be funded by cash generated from operations. After the Effective Date, the Debtor will cease all operations, and, therefore, there are no post-Effective Date operations to project and no funds to disburse from inexistent operations. This is not a novel concept: it is common in cases where the subchapter V debtor will not operate after the plan's effective date to include **NO** post-effective date projections whatsoever in the plan.[48]

---

[48] *See, e.g.*, *In re Piedmont Polymers & Fabrication, LLC*, Bankr. W.D.N.C. Case No. 20-31027, ECF No. 61 (plan included no projections (or other analysis) regarding a hypothetical 3–5 year rehabilitation plan; plan confirmed April 23, 2021); *In re Beal Manufacturing, Inc.*, Bankr. W.D.N.C. Case No. 21-30027, ECF No. 55 (plan included no projections (or other analysis) regarding a hypothetical 3–5 year rehabilitation plan; plan confirmed June 11, 2021); *In re Ozark Partners, Inc.*, Bankr. W.D.N.C. Case No. 21-30195, ECF No. 21 (plan included no projections (or other analysis) regarding a hypothetical 3–5 year rehabilitation plan; plan confirmed June 11, 2021); *In re Abraham Lincoln Christian Spiritist*, Bankr. W.D.N.C. Case No. 21-30232, ECF No. 25 (plan included no projections (or other analysis) regarding a hypothetical 3–5 year rehabilitation plan); *but see In re Carolinas Home*

Nevertheless (and ironically), this Plan actually does contain hypothetical projections based on the fiction that the Debtor would operate after the Effective Date (which, again, the Plan does not provide for),[49] thereby satisfying § 1190(1)(C) in any event.

Teresa's Objection complains that the projections are not month- or year-specific, but rather are based on an average monthly budget that is then extrapolated over a multi-year period. In general, subchapter V is not intended to require a financial expert in every case to predict what a particular debtor's income and expenses may be during, say, month seventeen or month twenty-nine or month fifty-three; these debtors typically do not have the resources to prepare projections so accurate or specific. This Debtor—with all of the aforementioned cash issues it has experienced—certainly cannot afford the financial experts that would be needed to complete the sort of projections that Teresa seeks in Teresa's Objection. Rather, the projections in the Plan reflect Pedie's best effort to hypothetically estimate average monthly expenses over the next three to five years based on his knowledge and experience.[50]

Furthermore, in this Case, the Debtor—under the control of Teresa's brother—did not provide cash collateral budgets based on the specific upcoming thirteen-week (or other) period, but rather based merely on an average monthly budget. That method (of projecting based on averages rather than the specific timing of actual receipts and disbursements) pacified all constituencies to the Case, including Teresa; at least while Teresa's brother was in charge. Pedie effectively started with Stober's budget and updated it based on recent developments and differences in methods between Stober and Pedie in operating the Debtor's business. Teresa did not object to this method when Stober did it; but now that Pedie has displaced her brother as the

---

*and Land Investments, LLC*, Bankr. W.D.N.C. Case No. 20-30619, ECF No. 28 (plan did include a simple, average one-month budget; plan confirmed on December 14, 2020).

[49]  ECF No. 104, Exhibit B, at 25–26.

[50]  *See* Pedie Affidavit, at ¶ 26.

Debtor's primary executive, the Debtor's method of projecting income and expenses is apparently no longer satisfactory to Teresa. Even if Teresa was correct that all subchapter V debtors must project based on the specific timing of actual receipts and disbursements during any given period, Teresa should be deemed to have waived this argument by not asserting it at earlier points in this Case when the Debtor—under her brother's direction—used the same method for cash collateral (and plan) purposes.

Based on all of the foregoing, the Plan satisfies § 1190(1)(C) for a number of reasons, including that the Plan is not funded out of future operations and that the projections provided are sufficient, especially within the context of subchapter V.

### D.     The Plan Satisfies § 1191(c)(2)

The primary thrust of Teresa's Objection is that the Plan is not fair and equitable because it allegedly fails to pay an amount greater than or equal to the Debtor's projected disposable income for a period of three to five years.

####    i.    The Comparison to the Unauthorized Plan is Unreliable and Irrelevant

Teresa's Objection complains that five years' worth of projected disposable income under the Plan (*i.e.*, $102,171) is less than five years' worth of projected disposable income under the Unauthorized Plan (*i.e.*, $177,625).[51] That comparison is unreliable and irrelevant.

First, the Debtor never had proper authority to file the Unauthorized Plan. Pursuant to applicable non-bankruptcy law, the Unauthorized Plan—which purported to dispose of Pedie's membership interests in the Debtor[52]—required Pedie's consent,[53] which Pedie never provided. Moreover, prior to the filing of the Unauthorized Plan, (A) Pedie and Stober had reached an

---

[51]    *See* Teresa's Objection, ECF No. 89, at 4, ¶ 8.

[52]    *See* ECF No. 57, at 1, 4, 5, 11–13, 17–18 (providing for an unauthorized auction of Pedie's personal property).

[53]    *See, e.g.,* N.C. GEN. STAT. § 57D-3-03.

agreement whereby Pedie would purchase Stober's interests in the Debtor and assume full control of the Debtor; (B) counsel for Pedie and counsel for Stober had essentially finalized the form of the documents to consummate the transaction; and (C) counsel for Pedie contacted counsel for the Debtor to confirm that counsel for the Debtor was aware of the transition in control; yet, counsel for the Debtor proceeded to file the Unauthorized Plan. Accordingly, the Unauthorized Plan was not a valid act of the Debtor.

Second, the Unauthorized Plan's projections were based on Stober's budget, which consistently proved overly optimistic over the course of this Case. In December, Stober's projections were $5,000 too optimistic. In January, Stober's projections were $25,000 too optimistic. In February, Stober's projections were $63,000 too optimistic. Pointing to Stober's projections as a more accurate benchmark of the Debtor's performance than Pedie's less optimistic version ignores history (and reality).

Third, assuming Stober will not testify at the confirmation hearing in support of his projections, Stober's opinions are not competent, reliable, or relevant evidence before the Court, and Pedie's projections are the best (and only) evidence the Court can consider at the confirmation hearing concerning the Debtor's theoretical performance under a hypothetical rehabilitation plan funded out of future operations.

ii. **The Projected Disposable Income Analysis Should Include Secured Creditor Payments**

Simply put, Teresa's Objection mixes fantasy with reality in evaluating the Plan's projected disposable income analysis. Specifically, Teresa's Objection argues that, because Newco will be paying the Peoples Bank Secured Claims in full on the Effective Date, then no secured creditor payments should be factored into the hypothetical projected disposable income

analysis.[54]  However, when a subchapter V plan does not contemplate that plan payments will be funded out of future operations of the debtor, the projected disposable income analysis is hypothetical, assuming a set of circumstances whereby the debtor proposed a plan to be funded out of future operations.  If the plan in this Chapter 11 Case was more of traditional rehabilitation plan (like the Unauthorized Plan), then secured creditors would be paid over time, and those payments would be factored into the disposable income analysis.

Looked at through a realistic lens, the Debtor has no post-Effective Date projected disposable income whatsoever under the Plan because Newco is making a lumpsum payment on or before the Effective Date in order to purchase the Debtor's business.  Thus, the Plan—which offers more than $100,000 to the bankruptcy estate separate and apart from what is being paid to Peoples Bank—satisfies § 1191(c)(2)(B) if the benchmark is what the Debtor's actual operations will produce in the 3–5 year period following Plan confirmation (*i.e.*, $0.00).

On the other hand, looked at through a hypothetical lens where Newco was not purchasing the Debtor's assets by paying Peoples Bank (and the estate) but rather the Debtor continued operations over a 3–5 year period, in order for the Debtor to have any income whatsoever (let alone disposable income), some monthly payment would need to be crammed down onto Peoples Bank to prevent immediate foreclosure of the Debtor's assets.  As a shorthand, the Plan's projections borrowed the monthly payment to be crammed down on Peoples Bank through the Unauthorized Plan.[55]  Although that figure is likely too low, the

---

[54]    *See* Teresa's Objection, ECF No. 89, at 4, ¶ 9.

[55]    *Compare* ECF No. 104, at 26 *with* ECF No. 57, at 28.  The $5,715.97 monthly payment to secured creditors in the Unauthorized Plan assumes a total secured debt of $557,995.98, interest at a rate of 4.25% per annum, amortized over ten (10) years.  On information and belief, Peoples Bank never agreed to these payments.  Thus, the secured claims payment line item in the Plan's projections is likely too low, notwithstanding Teresa's assertions to the contrary.

hypothetical financial projections must include some debt service payments to treat the Peoples Bank Secured Claims under § 1191(c)(1).

Even though it is not explicit in Teresa's Objection, to the extent Teresa is arguing that the secured creditor payments should not be included in the Plan's projected disposable income analysis because Paw is the primary obligor on the larger of the Peoples Bank notes and the Debtor a mere guarantor, that theory also fails.  The debts owed by the Debtor and Paw to Peoples Bank either matured prior to the Petition Date or were in a default called prior to the Petition Date.[56]  "It is generally recognized that a guaranty agreement is a separate debt instrument from the note and deed of trust, creating a separate obligation of the debtor, and a creditor is not required to liquidate any collateral or pursue the note borrower before seeking payment in full from the debtor."[57]  "In North Carolina, a personal guarantor is absolutely liable for the underlying debt, without regard for the obligation of other guarantors or obligors to pay the same or related debt."[58]  As the debts owed to Peoples Bank were fully liquidated, non-contingent, undisputed debts due and owing by the Debtor to Peoples Bank prior to the Petition Date, it is entirely appropriate—and indeed mandatory—that the Plan provide treatment for the Peoples Bank Secured Claims in a hypothetical rehabilitation plan analysis.

Moreover, Teresa had a full and fair opportunity after adequate notice to contest the Peoples Bank Secured Claims in this Chapter 11 Case.  However, the Court entered the Secured Status Order having heard no objection from Teresa (or anyone else), and the appeal period has long since expired on the Secured Status Order.  Teresa may not collaterally attack the Secured Status Order by arguing that the Debtor's Plan must ignore the Peoples Bank Secured Claims

---

[56]  *See* Pedie Affidavit, at ¶ 12.
[57]  *In re Green*, 574 B.R. 570, 580 (Bankr. E.D.N.C. 2017).
[58]  *In re Smith*, 2011 WL 5909430, at *1, Case No. 11-01951-8 (Bankr. E.D.N.C. Oct. 25, 2017).

because Peoples Bank has alternative sources of recovery in addition to the Debtor. Any number of preclusion, waiver, and estoppel concepts prohibit Teresa from attacking the Peoples Bank Secured Claim and/or the Secured Status Order through Teresa's Objection to the Plan.

Furthermore, even if the Court could and would evaluate whether Paw has sufficient assets to pay the Peoples Bank Secured Claims in full in the context of a hypothetical rehabilitation plan analysis, Paw does not have sufficient assets or enterprise value to satisfy the Peoples Bank Secured Claims in full. Paw's last balance sheet created in the ordinary course of business (by Stober)—ignoring claims against the Debtor and "goodwill" estimated by Stober—shows total assets for Paw, after factoring in depreciation, of only $67,601.48.[59] Also recall that the Debtor and Stober saw so little value in Paw that the Debtor's plan was to shut Paw down altogether in January, which only Pedie interrupted. Furthermore, since taking over Paw's operations in January, Pedie has infused an aggregate of $219,470 from his own funds into Paw to keep Paw operating.[60] Therefore, Paw's assets (primarily "furniture & fixtures") would not materially reduce the Peoples Bank Secured Claims, especially not to a degree where those claims would be ignored in a projected disposable income analysis in this Chapter 11 Case.

### iii. No Marketing Process is Required

Finally, Teresa's Objection asserts a non-statutory "fair and equitable" argument under § 1191(c)(2) that the Plan is not fair and equitable because the Newco is being allowed to purchase the Debtor's assets without testing the purchase price on the market.[61]

However, a formal marketing process is not always required in bankruptcy.[62] For example, in a case like this, where the secured creditor's claim so vastly exceeds the value of the

---

| | |
|---|---|
| 59 | *See* Pedie Affidavit, at ¶¶ 17–19. |
| 60 | *See* Pedie Affidavit, at ¶ 20. |
| 61 | *See* Teresa's Objection, ECF No. 89, at 4, ¶ 11. |

assets, there is no point in marketing the assets because no one (in reality, no one other than Pedie) would be willing to pay enough to satisfy the Peoples Bank Secured Claims and make a meaningful payment to the Debtor's bankruptcy estate; the law should never require a futile act. Indeed, the Debtor's creditors (some of which operate competitive or at least complementary business ventures)—and Teresa—have had notice of this Plan for several months, and no one has come forward to offer to pay more than Pedie is willing to pay (or even conduct due diligence). Pedie is the only one motivated to pay an amount for the Debtor's assets that will satisfy Peoples Bank and make a meaningful contribution to the Debtor's bankruptcy estate because Pedie is obligated on a guaranty to Peoples Bank. Pedie has been pumping hundreds of thousands of dollars into the Debtor and Paw since assuming control of them earlier this year[63]; the Debtor's EBITDA is effectively inexistent; there is little reason why anyone would be willing to pay more than even a $100,000 for this business, let alone an additional amount necessary to satisfy Peoples Bank's security interests.

Notably absent from Teresa's Objection is any complaint about the liquidation analysis provided in the Plan, which concludes that unsecured creditors will receive nothing through liquidation. Indeed, the liquidation analysis generously reduces the accounts receivable book value by only 50% when, in reality, a chapter 7 trustee rarely collects at such a high level when there is no operating enterprise to back those collections up. Likewise, the liquidation analysis discounts the office furniture book value by only 50%, when, in reality, a chapter 7 trustee would sell those assets for nearly nothing. Thus, even in a fantasy world where there were other assets

---

[62] *See* FED. R. BANKR. P. 6004(f)(1) (expressly authorizing private sales).

[63] Again, given the emergency nature of the cash needs, Pedie did not petition this court for approval of these transactions with the Debtor. Pedie hopes that confirmation of the Plan will moot any effort by him to seek allowance of a resulting administrative expense claim. However, in the event a third-party purchaser came forward and purchased the Debtor's assets, Pedie would likely assert an administrative expense claim based on his post-petition cash infusions.

that Peoples Bank could look to first in complete satisfaction of the Peoples Bank Secured Claims, after applying more realistic discounts, Pedie is still paying more through the Plan than the unsecured creditors could hope to recover in a liquidation context.

By all accounts, Pedie, through Newco, is overpaying for these assets. While the Debtor's trade vendors and other creditors are not happy about how small their recoveries might be in this case, they can accept the reality of the situation; all save Teresa.

## V. CONCLUSION

For these reasons and other reasons, the Court should overrule Teresa's Objection and confirm the Plan pursuant to § 1191 of the Bankruptcy Code.

This, the 20th day of August, 2021.

> */s/ Michael L. Martinez*
> Michael L. Martinez (N.C. State Bar No. 39885)
> Grier Wright Martinez, PA
> 521 East Morehead Street, Suite 440
> Charlotte, North Carolina 28202
> Telephone: 704/375.3720; Fax: 704/332.0215
> mmartinez@grierlaw.com
>
> *Attorneys for Dewyone "Pedie" King*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division**

In re:

**Custom Design Group, LLC**,

Debtor.

Case Number: 20-50463

Chapter 11, Subchapter V

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Dewyone King's Memorandum of Law in Support of Plan Confirmation* were served on those parties requesting notice in this case, the Bankruptcy Administrator, and the subchapter V trustee via ECF, and by first class mail, postage prepaid, on the party(ies) listed below.

Felton E. Parrish
Alexander Ricks PLLC
1420 E. 7th Street, Suite 100
Charlotte, NC 28204
*felton.parrish@alexanderricks.com*
Attorneys for Teresa King
(also served via email)

This is the 20th day of August, 2021.

　　　　　　　　　　　　　　　　　　　　/s/ Michael L. Martinez
　　　　　　　　　　　　　　　　　　　　Michael L. Martinez
　　　　　　　　　　　　　　　　　　　　Grier Wright Martinez, PA
　　　　　　　　　　　　　　　　　　　　521 East Morehead Street, Suite 440
　　　　　　　　　　　　　　　　　　　　Charlotte, North Carolina 28202
　　　　　　　　　　　　　　　　　　　　704/375.3720 (Phone); 704/332.0215 (Fax)
　　　　　　　　　　　　　　　　　　　　mmartinez@grierlaw.com